UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CATHY PACK as Personal Representative
of the Estate of RONALD ALEXANDER
HOWARD, II , Deceased,

CASE NO: 3:17-cv-778-J-34JBT

Plaintiff,

v.

DR. MARTIN I. HOLZMAN, MD;
DR. VERNON P. MONTOYA, MD;
DR. JOSEPH FARES, MD/ENT;
JULIE L. JONES- Secretary of Florida
Department of Corrections;
CORIZON HEALTH INC., a Foreign Profit Corporation,
an Agent or Ostensible Agent of Florida
Department of Corrections;
DR. OLUGBENGA OGUNSANWO, MD-Assistant
Secretary of Health Services
DANIEL P. CHERRY-Regional Medical Director;
THOMAS REIMERS, Health Service Director;
DR. MARIE J. GARCON, MD-Senior Physician;
DR. A. YU., MD;  DR. OSVALADO CONTARINI, MD;
DR. M. GONZALEZ, MD;
DR. C. CALDERON, MD-MDH, Medical Director
in their official and individual capacities as an Agent
or Ostensible Agent of Florida Department of Corrections
Jointly and Severally,

**PLAINTIFF'S SECOND
AMENDED COMPLAINT AND
JURY DEMAND**

Defendants.

| Geoffrey N. Fieger [297305] | Sean W. Drew (P33851) | John M. Phillips [477575] |
|---|---|---|
| **FIEGER, FIEGER, KENNEY & HARRINGTON, PC** | **DREW LAW OFFICE** | **LAW OFFICE OF JOHN M. PHILLIPS** |
| Counsel for Plaintiffs | Co-Counsel for Plaintiffs | Sponsoring Attorney for |
| 19390 West Ten Mile Road | Donahue Building | Pro Hac Vice, Co-Counsel |
| Southfield, MI 48075 | 302 Sycamore Street | 4230 Ortega Blvd. |
| (248)-355-5555 | PO Box 880 | Jacksonville, FL 32210 |
| (248)-355-0218-facsimile | Niles, MI 49120 | (904)-444-4444 |
| g.fieger@fiegerlaw.com | (269) 683-5121 | (904)-508-0683-facsimile |
| | (269) 683-2195- facsimile | jmp@floridajustice.com |
| | drewlawoffice@gmail.com | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT
## AND JURY DEMAND

NOW COMES, Plaintiff Cathy Pack as Personal Representative of the Estate of Ronald Alexander Howard, II, Deceased, by and through her attorneys, Geoffrey N. Fieger and Sean W. Drew, and for her complaint against the above-named Defendants, state as follows:

### JURISDICTION

1.      This action arises under the United States Constitution, particularly under the provisions of the Eighth and Fourteenth Amendments to the United States Constitution, and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code § 1983 and 1988.

2.      This Court has jurisdiction to this action under the provisions of Title 28 of the United States Code § 1331 and 1343.

3.      Plaintiff brings suit against each Defendant in both their individual and official capacities.

4.      Venue is appropriate in this judicial district pursuant to 28 U.S.C.§ 1391 (b)(1) and (2) and because all events and controversies occurred in this jurisdiction.

5.      The amount in controversy exceeds Seventy Five Thousand and no/100 ($75,000.00) exclusive of Plaintiff's claims for costs, interest, and punitive damages.

### PARTIES

6.      Plaintiff hereby reincorporates and restates each and every allegation contained the preceding paragraphs of this Complaint as if set forth herein.

7.      At all times relevant hereto, Plaintiff's decedent, Ronald Alexander Howard, II, [hereinafter, HOWARD] was a citizen and resident of Ocala, Marion County, State of Florida, United States of America, and as such was entitled to all rights, privileges and immunities

accorded to all citizens of the United States.

8.      Plaintiff, Cathy Pack, is the duly appointed Personal Representative of the Estate of decedent, the Estate of Ronald Alexander Howard, II, Marion County Probate File No.: 2017-CP-58, Letters of Administration, dated January 18, 2017.  Plaintiff is a resident of the City of Ocala, County of Marion, State of Florida.

9.      At all times relevant hereto, Defendant Corizon Health Inc., [hereinafter, Corizon] was a Florida corporation and was an agent and/or ostensible agent of the FDOC for the provision of medical care to inmates within the Holmes Correctional Institution [hereinafter, Holmes] and the secured medical wards at Reception and Medical Center [hereinafter, RMC] and the Memorial Hospital of Jacksonville [hereinafter, MHJ].

10.     At all times relevant hereto, Defendant, Dr. Olugbenga Ogunsanwo, MD., [hereinafter, Dr. Ogunsanwo] was employed by the FDOC as the Assistant Secretary of Health Services of the FDOC who was acting under the color of the laws, ordinances, regulations of the State of Florida and is being sued in his individual and official capacities.

11.     At all times relevant hereto, Defendant, Daniel P. Cherry, [hereinafter, Dr. Cherry] was employed by the FDOC as Regional Medical Director of the FDOC who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in his individual and official capacities.

12.     At all times relevant hereto, Defendant, Thomas Reimers, was employed by the FDOC as Health Service Director who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in his individual and official capacities.

13.     At all times relevant hereto, Defendant, Julie Jones, was employed by the FDOC

as Secretary of Florida Department of Corrections who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in her individual and official capacities.

14.     At all times relevant hereto, Defendant, Dr. C. Calderon, MD/MDH., [hereinafter, Dr. Calderon] was employed by the FDOC as Medical Director who was acting under the color and pretense of the laws, ordinances, regulations, and/or customs of the State of Florida and the FDOC and is being sued in his individual and official capacities.

15.     At all times relevant hereto, Defendant, Dr. Marie J. Garcon, MD, [hereinafter, Dr. Garcon] was an employee, agent, and/or ostensible agent of Defendant, Corizon, as Senior Physician who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in her individual and official capacities.

16.     At all times relevant hereto, Defendant, Dr. Martin I. Holzman, MD, [hereinafter, Dr. Holzman] was an employee, agent, and/or ostensible agent of Defendant, Corizon, as a medical physician who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in his individual and official capacities.

17.     At all times relevant hereto Defendant, Dr. Vernon P. Montoya, MD, [hereinafter, Dr. Montoya] was an employee, agent, and/or ostensible agent of Defendant, Corizon, as a medical physician who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in his individual and official capacities.

18.     At all times relevant hereto, Defendant, Dr. Joseph Fares, MD, [hereinafter, Dr. Fares] was an employee, agent, and/or ostensible agent of Defendant, Fares, as a medical physician who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in his individual and official capacities.

19.     At all times relevant hereto, Defendant, Dr. Oscalado Contarini, MD, [hereinafter, Dr. Contarini] was an employee, agent, and/or ostensible agent of Defendant, Corizon, as a medical physician who was acting under the color and pretense of the laws, ordinances, regulations, and/or customs of the State of Florida and the FDOC and is being sued in his individual and official capacities.

20.     At all times relevant hereto, Defendant, Dr. M. Gonzalez, MD., [hereinafter, Dr. Gonzalez] was an employee, agent, and/or ostensible agent of Defendant, Corizon, as a medical physician who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in his individual and official capacities.

21.     At all times relevant hereto, Defendant, Dr. A. Yu, MD., [hereinafter, Dr. Yu] was an employee, agent, and/or ostensible agent of Defendant, Corizon, as a medical physician who was acting under the color of the laws, ordinances, regulations, and/or customs of the State of Florida and is being sued in his individual and official capacities.

## FACTUAL STATEMENT

### A. PLAINTIFF'S REQUESTS FOR MEDICAL CARE/TREATMENT

22.     Plaintiff hereby reincorporates and restates each and every allegation contained the preceding paragraphs of this Complaint as if set forth herein.

23.     On September 18, 2009, Plaintiff was sentenced in Marion County Court and assigned as an inmate to Holmes Correctional Institution. At various times throughout his imprisonment and up until his death, HOWARD was transferred and admitted inpatient at RMC and MHJ.

24.     While housed at Holmes, RMC, and/or MHJ, HOWARD provided notice of his need for medical attention on several occasions through the submission of form(s) entitled

Inmate Sick-Call Request and/or Inmate Request requesting medical attention:

> 6/3/14 "Y'all charged me $5.00 dollars for no reason because I haven't been to medical since I renewed my shaving pass last year in October……"
> Response: "Received, Reviewed and evaluated 5/30/14 Dental Sick Call"

> 7/15/14 "Why do I half to write another sick call when I already wrote one last year and was charged already. All I want to know is why having' I been to see the dr. and it's been 9 months since I put the sick call in"

> 8/29/14 "I would like to know when I'm going to be put on the call out to see the Dr."

> 9/8/14 "When am I going to see the Doctor" … "The left side of my neck is swollen and I can barely move it."

> 10/6/14 "… Also my neck is still swollen and the pain has gotten terribly worser"

> 11/19/14 "…and also the left side of my neck seems to be getting worse"

> 12/17/14 "The swelling in my neck is spreading it is causing my whole body to ache"

> 2/17/15 "The lump in my neck is spreading and also on the left side of my neck a line of 4 lumps also on the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I'm losing my feeling in the left side of my body. My body hurts real bad."

## B.   PLAINTIFFS MEDICAL HISTORY/CHART AT HOLMES, RMC AND MMJ

25.   On September 19, 2014 HOWARD was seen by Nurse Z. White at Holmes for a sick call. The nurses' notes indicate HOWARD had sharp pain, swelling, and spasms in his neck and back which was exacerbated by activity. The notes indicate the pain worsened when HOWARD turned his neck to the right and that the pain radiated to his shoulders. The nurse provided Ibuprofen 200mg and heat packages indicating that HOWARD would be referred to a

physician if there was no improvement in five days.

26.     On September 21, 2014, HOWARD returned to Nurse Z. White who scheduled HOWARD for a medical exam by a physician because his condition had not improved.

27.     On September 23, 2014, HOWARD presented to Defendant, Dr. Ruiz Cordero, at Holmes regarding swelling, pain, and spasms in the left side of his neck. Defendant, Dr. Ruiz Cordero, ordered a urine dip, FSBS, and cervical spine X-rays. The X-Ray demonstrated prominent anterior spurring of C1.

28.     On October 6, 2014 HOWARD submitted an Inmate Sick-Call Request stating "… Also my neck is still swollen and the pain has gotten terribly worser"

29.     On October 7, 2014, HOWARD was seen by Nurse White at Holmes with complaints of worsening neck and back pain, swelling, and spasms. Nurse White's notes indicate swelling was present on the left side of neck and advised HOWARD to continue stretching exercises. The notes also indicate a plan to reassess the neck at a later date.

30.     On October 8, 2014 HOWARD was seen by Defendant, Dr. A. Yu, at Holmes Correctional Institution. Upon examination, Dr. Yu discovered a hard mass approximately 1 ½" x 3 along the sternomastoid muscle toward the mastoid on the left side of HOWARD's neck. Dr. Yu's notes also indicate HOWARD had limited neck movement. Dr. Yu's assessment of HOWARD was R/O hematoma L sternomastoid area. Dr. Yu indicated the mass was to be rechecked in two weeks.

31.     On October 13, 2014, HOWARD was seen by C. Pearson, LPN at Holmes with complaints of neck and back pain. HOWARD was requesting the day off from kitchen duty as a result of his pain. Nurse Pearson's notes indicate mild swelling was present on the left side of HOWARD's neck and HOWARD had full range of motion to neck and back. Nurse Pearson

indicated the complaints were not a true emergency.

32.     On October 14, 2014 HOWARD was seen by Defendant, Dr. Yu, at Holmes. HOWARD complained that he could not feel his right arm, headache, and pain 8/10 on his neck and left shoulder. Dr. Yu noted "all new onset neurological deficits/changes" with a plan to perform an ultrasound on the left neck. HOWARD was taken off work for 3 days.

33.     On October 15, 2014, HOWARD was seen by Defendant, Dr. Yu, at Holmes Correctional Institution for a follow up appointment regarding HOWARD's left neck mass and right arm numbness. Dr. Yu's notes refer to the mass as a "knot" and indicate the mass was a result of a fall that occurred in September 2014. The notes indicate the mass has remained the same size with pain mainly in the left shoulder and back. Dr. Yu's assessed HOWARD with a muscle strain and knot in the left side of neck with a plan of ibuprofen, Flexeril, warm compresses, and to follow up in three weeks.

34.     On October 20, 2014, HOWARD was seen by Nurse Practitioner Pearson at Holmes. Howard indicated the whole top half of his body was in pain, pain 8/10 in his head and neck, and swelling. The notes indicate HOWARD's pain has been going on for months.

35.     On October 21, 2014, HOWARD was seen by Defendant, Dr. Yu, and Nurse White at Holmes. HOWARD was seen for the mass on his neck, and his head and neck pain. HOWARD's weight was recorded as 191 lbs. Dr. Yu's plan indicated HOWARD should decrease weight and decrease salt intake with a referral to an optometrist.

36.     On October 28, 2014, an ultrasound of the soft tissue left neck was undertaken per the October 14, 2014 order.  The radiology report, reflected: "Impression: The palpable mass most likely represents a complex cyst, possibly a necrotic lymph node.  Recommendation:  CT or MRI imaging of the neck without and with contrast."

37.     On October 29, 2014, HOWARD was seen by Defendant, Dr. Yu at Holmes Correctional Institution with complaints of left neck mass and neck and shoulder pain. Dr. Yu's notes reflect review of the ultrasound report. Dr. Yu's plan states "indurated mass was 1 ½" x 3", please follow up every week for progress of mass resolution if not resolving, may need CT or MRI as ultrasound report suggested."

38.     On November 11, 2014, HOWARD was seen by Defendant, Dr. M. Krevfels at Holmes. Dr. Krevfels notes indicate the mass on HOWARD's neck was enlarged. Dr. Krevfels plan included a CT of HOWARD's neck, various blood tests including CBC, CMP, HIV, EBV, and a referral to ENT or general surgeon for biopsy. Dr. Krevfels prescribed HOWARD Keflex.

39.     A November 11, 2014, note by Defendant, Dr. Krevfels, indicates that he spoke with Defendant, Dr. Cherry, Regional Medical Director, who had "concerns with probable diagnosis and diagnostic testing to include CAR, CT soft tissue neck, labs and  CT chest, if CAR suspicious, as well as transfer to Lake Butler for general surgeon consult, transfer to be classified as "Urgent."

40.     On November 11, 2014, Defendant, Dr. Krevfels, completed the request for prior approval health care services. Same was marked as Urgent (as opposed to routine or emergent). Diagnosis: Enlarging left neck mass, date of onset September 24, 2014.  Surgery procedure requested, CT soft tissue neck.  Refer to ENT or General Surgeon.

41.     On November 18, 2014, HOWARD was transferred from Holmes Correctional Institution to the secured medical ward at RMC.

42.     On November 18, 2014, HOWARD was examined by Defendant, Dr. Fares, ENT, at RMC. Dr. Fares noted abnormal HEENT and abnormal neck with comments of "left tonsil lesion suspicious of malignancy rather than SCCA left neck metaphases." Dr. Fares' impression

was a left tonsil lesion with a plan for direct left biopsy excision of the left tonsil. However, Dr. Fares did not perform the biopsy or excise the tonsil until February 26, 2015, a passage of one hundred days.

43. On November 19, 2014, HOWARD submitted an Inmate Sick-Call Request: "…and also the left side of my neck seems to be getting worse"

44. On November 20, 2014, HOWARD was examined by Nurse E. Walters at RMC. HOWARD presented with a chief complaint of neck and shoulder pain. Nurse Walter's notes include current symptoms of sore throat, a tumor on the left side of neck, and swollen neck glands. HOWARD's weight was recorded as 186 lbs.

45. On November 21, 2014 a CT was performed of HOWARD's neck 23 days after the initial recommendation of October 28, 2014. The clinical data indicated new onset dyspnea. The findings include multiple enlarged enhancing nodules of the left neck with the largest measuring 2.4 x 1.8 cm in size and a conglomerate mass of enhancing nodules within the left neck measuring 6.0 x 2.2 cm. The findings also indicate no right neck adenopathy and enlarged prevertebral soft tissue with narrowing of the oropharynx. The impression: Abnormal examination with extensive left neck enhancing nodules likely adenopathy. There is prevertebral swelling with critical narrowing of the oropharynx as above. Recommend additional evaluation with direct visualization. Clinical correlation."

46. On November 24, 2014, HOWARD was examined by Nurse S. Loznicka at RMC. HOWARD presented with complaints of increased pain and swelling in his left neck. The plan indicates to follow up with Dr. Contarini the following day. A medical note by Defendant, Dr. Anandijiwala, confirmed the planned November 25, 2014 appointment with Defendant, Dr. Contarini.

47.     On November 25, 2014, HOWARD was seen in surgery by Defendant, Dr. Contarini, at RMC. Dr. Contarini's findings include a large mass on left neck which he indicated is possibly an enlarged parotid gland. Dr. Contarini recommended HOWARD present to MHJ for a core biopsy of the left neck mass ASAP.  Dr. Contarini recommended a CT neck and chest.

48.     On December 12, 2014, Defendant, Dr. Gonzalez, at MHJ was the attending physician for a direct ultrasound guided fine needle aspiration and core biopsy of the large left neck mass where two specimens were obtained from each procedure.

49.     On December 16, 2014 the Surgical Pathology final diagnosis was issued by MHJ regarding the December 12, 2014 biopsies with a final diagnosis of "POORLY DIFFERENTIATED SQUAMOUS CELL CARCINOMA WITH EXTENSIVE TUMOR NECROSIS".

50.     On December 17, 2014, HOWARD made an Inmate Sick-Call Request stating "The swelling in my neck is spreading it is causing my whole body to ache"

51.     On December 30, 2014, Defendant, Dr. A.C. Maler, MD JD, who is the RCM Medical Director, made a medical appointment for HOWARD scheduled for January 6, 2015.

52.     On December 31, 2014 HOWARD appeared for a sick call requesting pain medication. HOWARD was provided ibuprofen and was informed of a future appointment with Defendant, Dr. Contarini, with whom he could discuss pain management.

53.     On January 6, 2015, HOWARD was seen in surgery by Defendant, Dr. Contarini, whose notes indicate review of the December 16, 2014 Surgical Pathology final diagnosis of squamous cell carcinoma. Dr. Contarini recommended: "Emergent to Fares MD for January 7, 2015."

54.     A note from January 7, 2015, indicates that HOWARD was not seen by Dr. Fares

on January, 7, 2015 and that the appointment needs to be rescheduled. HOWARD was not seen by Defendant, Dr. Fares, until January 21, 2015.

55.     On January 21, 2015, HOWARD was seen by Defendant Dr. Fares, ENT at RMC. Dr. Fares notes indicate a left tonsillar mass with extension into the neck with a large neck mass obviously very suspicious of malignancy. Dr. Fares scheduled a direct biopsy for February 26, 2015.

56.     On February 17, 2015, HOWARD submitted an Inmate Sick-Call Request stating: "The lump in my neck is spreading and also on the left side of my neck a line of 4 lumps also on the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I'm losing my feeling in the left side of my body.  My body hurts real bad."

57.     On February 19, 2015, HOWARD appeared at medical call and was seen by Nurse W. Johnson. Nurse Johnson's notes indicate HOWARD was having difficulty breathing, coughing up blood, chest tightness, loss of strength on left side of body, and difficulty eating. The notes also indicate HOWARD weighed 160 lbs during this visit, which is a loss of 26 lbs since November 20, 2014. HOWARD was immediately sent to urgent care for assessment. D.R.. Pollard PA-C at the urgent care stated agreement with the staff nursing note.

58.     On February 26, 2015, HOWARD underwent surgery by Defendant, Dr. Fares, one hundred days after Dr. Fares' initial examination and recommendation for surgery on November 18, 2014. Dr. Fares performed a direct laryngoscopy, left tonsillectomy, and biopsy of lesion.  The Preoperative and Post Operative Diagnoses per Defendant, Dr. Fares, was "Left tonsillar mass with extension into the neck with a large neck mass obviously very suspicious of malignancy."

59.     Defendant, Dr. Fares', Operative Report indicates Dr. Fares removed a very hard

lesion from HOWARD which favored squamous cell carcinoma. Dr. Fares performed another punch biopsy which was sent to a pathologist who confirmed a diagnosis of squamous cell carcinoma.

60.     Upon extubation post-surgery, HOWARD experienced some difficulty breathing, oxygen saturation started dropping, and upon inspection, there was severe swelling of the uvula. Defendant, Dr. Fares, then performed a uvulectomy.

61.     On February 27, 2015, a consultation request for emergency radiation therapy was made and signed by Defendant, Dr. M. Gonzalez, on March 2, 2015, and approved by Defendant, Calderon, on March 3, 2015.

62.     On March 2, 2015, HOWARD was seen by Defendant, Dr. Marie J. Garcon, Senior Physician at RMC for pain whose notes indicate HOWARD was admitted for cancer treatment.

63.     On March 3, 2015, HOWARD was seen by Defendant, Dr. Vernon Montoya, MD Oncolocy/Hematology at RMC. Dr. Montoya issued a consult request to Defendant, Dr. Martin Holzman.  Dr. Montoya issued an "emergent" consult request for evaluation for radiation therapy of left pharynx mass, noting the size as 9x9cm.

64.     On March 11, 2015, HOWARD was finally seen by Defendant, Dr. Holzman, a passage of eight days from the emergent request by Defendant, Dr. Montoya. Dr. Holzman's impression was "Stage IVB squamous cell carcinoma of NPX/OPX with L N3 disease.  Dr. Holzman recommended stain tissue, MRI brain/face/neck ASAP,  IV access port ASAP, Dental clinic ASAP.  Now, r/o left internal capsule, r/o right 7th nerve compression, r/o intercranial extension, refer to neurology clinic ASAP, return for PET/CT (SIM & F/U of MRI)."

65.     On March 17, 2015, HOWARD underwent a dental examination by Dr. Turner,

III, DMD at RMC. Dr. Turner's notes indicate HOWARD has no teeth indicated for extraction pre-radiation of head and neck.

66.     On March 26, 2015, HOWARD was seen by Dr. Carlos Gama, Neurologist, at RMC. Dr. Gama recommended MRI of brain, cervical spine with and without contrast, oncology consult, radiation therapy consult, and strongly recommended transferring patient to MMC as soon as possible.  Dr. Gama's note indicates he discussed his findings with Dr. Gonzalez on March 26, 2016.

67.     On March 27, 2015, HOWARD was transferred from RMC to MHJ. HOWARD was seen by Dr. Phuc Tran at MHJ who indicated HOWARD presented with reports of confusion, right sided weakness, and a right-sided node that appears to be malignant.

68.     On March 28, 2015, HOWARD was seen by Defendant, Dr. Marie Valente, at MHJ. Dr. Valente noted HOWARD was being scheduled for chemotherapy and a PEG tube was to be inserted. Dr. Valente reviewed imaging studies from this hospitalization including C-Spine, brain, and orbit MRI and summarized the results as "paraspinal/epidural tumor spread from the primary head and neck malignancy with severe canal stenosis and cord compromise present from C2-C3-C7.  He also has been a chronic lymphadenopathy in the left neck." Dr. Valente previously noted an "extremely large left neck mass".

69.     On March 29, 2015, HOWARD was seen again by Defendant, Dr. Fares, ENT, at MHJ. Dr. Fares noted the mass was so large that it was inoperable. Dr. Fares recommended radiation therapy to shrink the tumor in order to operate, after such point HOWARD could undergo more aggressive chemotherapy, with supportive Bell's Palsy treatment. Dr. Fares stated HOWARD seems "to be deteriorating very rapidly and I believe he is a little bit leaner and loss some weight even the last few weeks since I did his biopsy."  No treatment was ever given to

Plaintiff's decedent.

70.     On March 30, 2015, HOWARD was discharged from Memorial Hospital Jacksonville. Dr. Hernan R. Chang indicated HOWARD was scheduled for outpatient chemo and radiation therapy which Dr. Chang noted should start as soon as possible. Dr. Chang indicated HOWARD was to be discharged to RMC with follow up to Dr. Montoya for radiation as soon as possible.

71.     On March 30, 2015, Dr. Jean Dure, a physician at RMC submitted a consultation request on behalf of HOWARD for an emergency oncology consultation for evaluation and treatment with Dr. Montoya. Dr. C. Calderon, MD MPH CCHP Medical Director at RMC signed off on the request.

72.     On March 31, 2015, HOWARD was seen by Defendant, Dr. Garcon at RMC with a request for an increase in pain medication. Defendant, Dr. Garcon's, notes indicate Dr. Scibelli suggests emergent radiation and chemotherapy at RMC. HOWARD was not provided with pain medication other than over the counter Ibuprofen.

73.     On April 7, 2015, HOWARD was seen by Defendant, Dr. Montoya, oncology/hematology. Dr. Montoya's notes indicate that radiation therapy is being held due to the size of the tumor. Dr. Montoya's plan indicates HOWARD will start chemotherapy and will receive Carboplatin and Taxol every four weeks.

74.     On Defendant, Dr. Montoya's, April 7, 2015 medical note, HOWARD's weight was recorded as 150 lbs which is 41 lb weight loss since October 21, 2014. HOWARD weight loss measured 21.45 percent in five months.

75.     On April 13, 2015, HOWARD was found on the floor by RMC nursing staff in an altered mental state. HOWARD was then seen by Defendant, Dr. Garcon, who decided to

transfer HOWARD to MHJ.

76.     On April 13, 2015, HOWARD was admitted to MHJ. HOWARD was examined by Dr. Hernan R. Chang, MD, whose medical notes indicate a review of HOWARD's medical record. Dr. Chang noted HOWARD was seen 2 ½ weeks ago at MHJ and was presently admitted for change in mental status.

77.     On April 13, 2015, HOWARD was seen by Defendant, Dr. Fares, at MHJ, whose notes indicate "I did have a long discussion with the patient, I did explain to him that we will/might given trigger radiation and chemotherapy and this tumor becomes small and resectable, I will have radiation stop at 5000, do surgery because the wound will still heal good at 5000 rads and will continue after this.  The patient after now, he has been seen but he did not stop having any radiation therapy or chemotherapy.

78.     On May 22, 2015, HOWARD was discharged from MHJ to RMC. Dr. Chang's discharge notes indicate HOWARD was a previous MHJ patient who was previously discharged to RMC and "was supposed to have chemotherapy and radiation therapy, but this treatments did not take place." Dr. Chang's notes further indicate after admission to MHJ, HOWARD was started on chemotherapy but after two days of treatment developed bradycardia and went into cardiorespiratory arrest. Imaging indicated the tumor was growing and causing spinal cord compression leading to quadriplegia. HOWARD developed MRSA pneumonia. The discharge summary also indicated severe protein-calorie malnutrition.

79.     On June 2, 2015, HOWARD was seen by Defendant, Dr. Montoya, at RMC. "Mr. Howard was seen today for follow-up.  He was initially seen by me on 3/4/2015.  At that time, he was diagnosed with a large pharynx cancer.  He was referred to radiation therapy.  Radiation therapy was not offered due to the massive tumor size.  He was again seen by me on 4/7/2015.

At that time, we planned to start him on Carboplatin and Taxol; however, he never received the chemotherapy. Assessment and Plan:  Patient with markedly progressive disease. I doubt chemotherapy would be beneficial for this patient, I would recommend palliative care.  If he is eligible for early release, this should be considered.  We will see him on a prn basis."

80.     After June 3, 2015, there is no medical charting-records regarding HOWARD at RMC, MHJ, or any medical provider until HOWARD's arrival at Shands University of Florida on July 6, 2015.

81.     All Defendants remained deliberately indifferent to HOWARD's blatant diagnosed serious medical condition. All Defendants allowed the squamous cell carcinoma to spread unabated to the point HOWARD became a quadriplegic. Eventually the cancer metastasized to HOWARD's brain. HOWARD became dehydrated, severely malnourished, and subject to sepsis infection. HOWARD was 23 years old when he died on July 14, 2015.

**COUNT I**
**VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, JOSEPH FARES, M.D.**

82.     Plaintiff hereby reincorporates and restates each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

83.     At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

84.     At all times relevant hereto, Defendant Joseph Fares, M.D., a board certified Physician in Otolaryngology (ENT), had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no

treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

85.    HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, said requests would have been in HOWARD's medical file. Dr. Fares, would have examined and read on the various contacts he had with HOWARD. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

86.    Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Fares, who additionally had firsthand knowledge of HOWARD's medical condition through multiple examinations performed by Dr. Fares himself. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. Through this point in time, no treatment and/or pain medication was provided to HOWARD.

87.    Defendant, Dr. Fares, examined HOWARD on multiple occasions, the first believed to have been November 18, 2014 where Dr. Fares indicated HOWARD's left tonsil lesion was suspicious of malignancy and recommended a biopsy which he did not perform until

February 26, 2015, a passage of one hundred days.

88.    Post December 16, 2014 diagnosis of squaous cell carcinoma, Dr. Contarini, on January 6, 2015, recommended "emergent" appointment with Dr. Fares for January 7, 2017, however, Dr. Fares did not see HOWARD until January 21, 2015. Given the diagnosis of squamous cell carcinoma, Dr. Fares should have acted prior to the next appointment of January 21, 2015.

89.    On January 21, 2015, Defendant, Dr. Fares, examined HOWARD and indicated the tonsillar mass extended into the neck which was "very suspicious of malignancy." Dr. Fares scheduled a direct biopsy, but the appointment was not until February 26, 2015, more than a month later. On February 26, 2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma.

90.    On March 29, 2015, Defendant, Dr. Fares, examined HOWARD at MHJ where Dr. Fares determined the tumor was so large that it was inoperable. Dr. Fares recommended radiation to shrink the tumor but no such treatment was ever provided to HOWARD. Dr. Fares noted HOWARD "seems to be deteriorating very rapidly."

91.    On April 13, 2015, HOWARD was again seen by Dr. Fares who again indicated a need to shrink the tumor in order to operate, however, no such treatment was provided to HOWARD and Dr. Fares did nothing to follow up and/or implement this course of care.

92.    Despite knowledge of HOWARD's diagnosis of squamous cell carcinoma and knowledge of the recommended course of care including radiation and chemotherapy, Dr. Fares turned a blind eye to HOWARD and did nothing to follow up and/or implement this course of care and did not implement a pain management plan for HOWARD.

93.    Defendant, Dr. Fares, violated HOWARD's civil rights when Dr. Fares exhibited

deliberate indifference toward HOWARD's serious medical condition in the following ways:

a. Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

b. Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c. Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d. Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e. Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

f. Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

g. Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

h. Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i. Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by

turning a blind eye to Plaintiff's decedent's serious medical needs;

j.   Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

94.   As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

95.   That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a.   Reasonable medical, hospital, funeral and burial expenses;
b.   Inhumane and tortuous conscious pain and suffering;
c.   Loss of financial support;
d.   Loss of service;
e.   Loss of gifts or other valuable gratuities;
f.   Loss of comfort, society and companionship;
g.   Loss of consortium;
h.   Economic and non-economic compensatory damages;
i.   Punitive damages;
j.   Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT II
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE

## INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS
## DEFENDANT, VERNON MONTOYA, M.D.

96.     Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

97.     At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

98.     At all times relevant hereto, Defendant Vernon P. Montoya, M.D.is a board certified Physician in Oncology/Hematology, who had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

99.     HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, and said requests would have been in HOWARD's medical file. Defendant, Dr. Montoya would have examined and read this file on the various contacts he had with HOWARD. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

100.    Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Montoya, who additionally had firsthand knowledge of HOWARD's

medical condition through multiple examinations performed by Dr. Montoya himself. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma.

101.    Defendant, Dr. Montoya, examined HOWARD on multiple occasions, the first believed to have been March 3, 2015, at which point HOWARD had already been diagnosed with cancer. During this consultation, Dr. Montoya prepared an "emergent" consult request to Defendant, Dr. Holzman for radiation therapy. However, this plan was never implemented and Dr. Montoya did nothing to follow up and/or implement this course of care. Despite the obvious recognition by Dr. Montoya of HOWARD's life threatening medical condition, the consult was not made until March 11, 2015.

102.    On March 30, 2015, HOWARD was discharged from MHJ with indications in the discharge summary by Dr. Chang that HOWARD would undergo radiation by Dr. Montoya as soon as possible. Also on March 30, 2015 an "emergent" consultation request was submitted by Dr. Jean Dure at RMC for treatment with Dr. Montoya.

103.    HOWARD was not seen by Dr. Montoya until April 7, 2014, at which point Dr. Montoya determined radiation therapy would not occur due to the size of the tumor. Dr. Montoya instead stated he would begin HOWARD on chemotherapy. In spite of Dr. Montoya's knowledge of a clear diagnosis of a malignant neck mass and his own recommendation for chemotherapy, Dr. Montoya turned a blind eye and did NOT institute his own ordered treatment plan.

104.    On June 2, 2015, Dr. Montoya examined HOWARD for a third and final time before HOWARD's death. In Dr. Montoya's notes, he indicates the April 7, 2015 plan was to implement chemotherapy and admits HOWARD never received chemotherapy. He further indicates "patient with markedly progressive disease...I doubt chemotherapy would be beneficial for this patient."

105.    Defendant, Dr. Montoya owed a duty to Plaintiff's decedent to ensure that his own ordered treatment plan was carried out and complied with. Instead of following through on his prescribed care for this patient, Dr. Montoya turned a blind eye to Mr. Howard's serious medical condition and did not implement a pain management plan for HOWARD.

106.    Defendant, Dr. Montoya, violated HOWARD's civil rights when Dr. Montoya exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

a.  Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

b.  Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c.  Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d.  Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e.  Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

    f.   Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

    g.   Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

    h.   Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

    i.   Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

    j.   Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

107.   As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

108.   That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a. Reasonable medical, hospital, funeral and burial expenses;
b. Inhumane and tortuous conscious pain and suffering;
c. Loss of financial support;
d. Loss of service;
e. Loss of gifts or other valuable gratuities;
f. Loss of comfort, society and companionship;
g. Loss of consortium;
h. Economic and non-economic compensatory damages;
i. Punitive damages;
j. Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT III
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, MARTIN I HOLZMAN, M.D.

109. Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

110. At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

111. At all times relevant hereto, Defendant Martin I. Holzman, M.D.is a board certified Physician in Radiation Oncology, who had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

112. HOWARD issued several written requests for medical care and treatment as

outlined in Paragraph 22 of this Complaint, and requests would have been in HOWARD's medical file. Defendant Dr. Holzman, would have examined and read that file on the various contacts he had with HOWARD. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

113.   Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Holzman, who additionally had firsthand knowledge of HOWARD's medical condition through examination performed by Dr. Holzman himself. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. HOWARD was never provided cancer treatment and/or pain medication.

114.   On March 30, 2015, HOWARD was discharged from Memorial Hospital Jacksonville with indications in the discharge summary by Dr. Chang that HOWARD would undergo radiation by Dr. Holzman as soon as possible. Also on March 30, 2015 an "emergent" consultation request was submitted by Dr. Jean Dure at RMC for treatment with Dr. Holzman.

115.   It was not until March 11, 2015, that HOWARD was examined by Dr. Holzman, at which point, HOWARD had already been diagnosed with cancer. Dr. Holzman's notes

indicate HOWARD had Stage IVB squamous cell carcinoma. Dr. Holzman issued orders to prepare Plaintiff's decedent for radiation therapy, such as dental, IV access port, stain tissue.

116.    The March 11, 2015 orders were completed by March 26, 2017, nevertheless, Defendant, Dr. Holzman, never commenced radiation therapy even though he ordered it. In spite of Dr. Holzman's knowledge of a clear diagnosis of Stage IVB squamous cell carcinoma and his own recommendation for radiation therapy, Dr. Holzman turned a blind eye and did NOT institute his own ordered treatment plan and did not implement a pain management plan for HOWARD.

117.    Defendant, Dr. Holzman, violated HOWARD's civil rights when Dr. Holzman exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

    a.  Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

    b.  Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

    c.  Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

    d.  Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

    e.  Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

    f.  Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically

required, and institute recommended treatment;

g. Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

h. Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i. Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

j. Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

118.     As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

119.     That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a.   Reasonable medical, hospital, funeral and burial expenses;

b. Inhumane and tortuous conscious pain and suffering;
c. Loss of financial support;
d. Loss of service;
e. Loss of gifts or other valuable gratuities;
f. Loss of comfort, society and companionship;
g. Loss of consortium;
h. Economic and non-economic compensatory damages;
i. Punitive damages;
j. Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT IV
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, OSVALDO CONTARINI, M.D.

120.    Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

121.    At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

122.    At all times relevant hereto, Defendant Osvaldo Contarini, M.D. was a board certified Physician in Radiation Oncology, who had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

123.   HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, and said requests would have been in HOWARD's medical file. Defendant, Dr. Contarini would have examined and read that file on the various contacts he had with HOWARD. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

124.   Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Contarini, who additionally had firsthand knowledge of HOWARD's medical condition through examination performed by Dr. Contarini himself. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. HOWARD was never provided cancer treatment and/or pain medication.

125.   On November 24, 2014, HOWARD presented to medical services at Holmes with complaints of increased neck pain and swelling. HOWARD was scheduled to follow up with Defendant, Dr. Contarini, the following day.

126.   On November 25, 2014, Defendant, Dr. Contarini, examined HOWARD with notes indicating the large neck mass was possibly an enlarged parotid gland. Dr. Contarini

recommended transfer to MHJ for a core biopsy "ASAP."

127.    On December 12, 2014 HOWARD underwent a sonographic left neck mass fine needle aspiration biopsy which confirmed squamous cell carcinoma.

128.    On December 31, 2014, HOWARD appeared for a sick call requesting pain medication for the neck mass. HOWARD was told to discuss pain management with Defendant, Dr. Contarini, at his next appointment.

129.    On January 6, 2015, HOWARD was seen by Defendant, Dr. Contarini. Dr. Contarini did not discuss pain medication with HOWARD, and issued no orders other than "referral emergent" to Dr. Fares for January 7, 2015. However, the ordered consult per Dr. Contarini to see Dr. Fares in the ENT clinic did not occur and was not rescheduled by Dr. Contarini until January 21, 2015.

130.    Forty-two days lapsed between Defendant, Dr. Contarini's, first examination and final examination on January 21, 2015. Defendant, Dr. Contarini, turned a blind eye on HOWARD during that forty-two day period; he did not issue pain medication and did not recommend or institute a treatment regimen despite knowledge of the December 16, 2014 surgical pathology report diagnosing squamous cell carcinoma.

131.    Despite knowledge of HOWARD's diagnosis of squamous cell carcinoma and knowledge of the recommended course of care including radiation and chemotherapy, Dr. Contarini turned a blind eye to HOWARD and did nothing to follow up and/or implement this course of care and did not implement a pain management plan for HOWARD.

132.    Defendant, Dr. Contarini, violated HOWARD's civil rights when Dr. Contarini exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

a.  Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

b.  Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c.  Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d.  Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e.  Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

f.  Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

g.  Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

h.  Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i.  Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

j.  Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

133.   As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

134.   That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a.  Reasonable medical, hospital, funeral and burial expenses;
b.  Inhumane and tortuous conscious pain and suffering;
c.  Loss of financial support;
d.  Loss of service;
e.  Loss of gifts or other valuable gratuities;
f.  Loss of comfort, society and companionship;
g.  Loss of consortium;
h.  Economic and non-economic compensatory damages;
i.  Punitive damages;
j.  Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT V
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, MARIE GARCON, M.D.

135.   Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

136.   At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

137.   At all times relevant hereto, Defendant Maria Garcon, M.D. was a Senior Physican at RMC, who had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

138.   HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, and said requests would have been in HOWARD's medical file. Defendant, Dr. Garcon, would have examined and read that file on the various contacts she had with HOWARD. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

139.   Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Garcon, who additionally had firsthand knowledge of HOWARD's medical condition through examination performed by Dr. Garcon herself. On October 28, 2014,

an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. HOWARD was never provided cancer treatment and/or pain medication.

140.    Defendant, Dr. Garcon, examined HOWARD on multiple occasions, the first believed to have been March 2, 2015 whose notes indicate HOWARD was admitted to RMC for cancer treatment. HOWARD was seen by Dr. Garcon with complaints of significant pain.

141.    On March 31, 2015, HOWARD was seen by Defendant, Dr. Garcon, with a request for an increase in pain medication. Dr. Garcon's notes indicate suggestions for emergent radiation and chemotherapy however, no such treatment was provided to HOWARD. Further, no pain medication other than over the counter ibuprofen was issued to HOWARD.

142.    On April 13, 2015, HOWARD was examined by Dr. Garcon subsequent to being found collapsed on the ground in an altered mental state.

143.    Despite knowledge of HOWARD's diagnosis of squamous cell carcinoma and knowledge of the recommended course of care including radiation and chemotherapy, Dr. Garcon turned a blind eye to HOWARD and did nothing to follow up and/or implement this course of care and did not implement a pain management plan for HOWARD.

144.    Defendant, Dr. Garcon, violated HOWARD's civil rights when Dr. Garcon exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

    a.  Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

b. Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c. Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d. Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e. Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

f. Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

g. Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

h. Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i. Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

j. Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

145.     As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

146.     That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a.  Reasonable medical, hospital, funeral and burial expenses;
b.  Inhumane and tortuous conscious pain and suffering;
c.  Loss of financial support;
d.  Loss of service;
e.  Loss of gifts or other valuable gratuities;
f.  Loss of comfort, society and companionship;
g.  Loss of consortium;
h.  Economic and non-economic compensatory damages;
i.  Punitive damages;
j.  Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT VI
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, M. GONZALEZ, M.D.

147.    Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

148.    At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

149.    At all times relevant hereto, Defendant M. Gonzalez, M.D., had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

150.    HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, said requests would have been in HOWARD's medical file. The very file Defendant, Dr. Gonzalez, would have examined and read on the various contacts he had with HOWARD. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

151.    Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Gonzalez, who additionally had firsthand knowledge of HOWARD's medical condition through examination performed by Dr. Gonzalez himself. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On

November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. HOWARD was never provided cancer treatment and/or pain medication.

152.    Defendant, Dr. Gonzalez, examined HOWARD on multiple occasions, the first believed to have been December 12, 2014 when Dr. Gonzalez performed the direct ultrasound guided fine needle aspiration and core biopsy which produced the initial diagnosis of squamous cell carcinoma.

153.    On March 2, 2015, Dr. Gonzalez signed off on a consultation request on behalf of HOWARD for radiation therapy to treat the squamous cell carcinoma.

154.    On March 26, 2015, Dr. Gonzalez discussed with Dr. Gama, Dr. Gama's neurology examination who recommended MRI of brain and cervical spine, oncology consult, and radiation therapy consult.

155.    Despite knowledge of HOWARD's diagnosis of squamous cell carcinoma and knowledge of the recommended course of care including radiation and chemotherapy, Dr. Gonzalez turned a blind eye to HOWARD and did nothing to follow up and/or implement this course of care and did not implement a pain management plan for HOWARD.

156.    Defendant, Dr. Gonzalez, violated HOWARD's civil rights when Dr. Gonzalez exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

    a.  Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

    b.  Failed to determine and recognize the immediate need for medical

attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c.  Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d.  Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e.  Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

f.  Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

g.  Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

h.  Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i.  Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

j.  Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

157.  As a direct and proximate result of the constitutional violations alleged above,

HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

158.    That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

   a.  Reasonable medical, hospital, funeral and burial expenses;
   b.  Inhumane and tortuous conscious pain and suffering;
   c.  Loss of financial support;
   d.  Loss of service;
   e.  Loss of gifts or other valuable gratuities;
   f.  Loss of comfort, society and companionship;
   g.  Loss of consortium;
   h.  Economic and non-economic compensatory damages;
   i.  Punitive damages;
   j.  Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT VII
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, DANIEL P. CHERRY, M.D.

159.    Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

160.    At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

161.    At all times relevant hereto, Defendant Daniel Cherry, M.D., Regional Medical Director, had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

162.    HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, said requests would have been in HOWARD's medical file. The very file Defendant, Dr. Cherry, would have examined and read when affirming consultation requests and/or examinations. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

163.    Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Cherry, who had knowledge of HOWARD's medical condition. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous

cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. HOWARD was never provided cancer treatment and/or pain medication.

164.    On November 11, 2014, HOWARD presented to Dr. Krevfels whose notes indicate an enlarged neck mass. Dr. Krevfels consulted with Defendant, Dr. Cherry, who had "concerns with probable diagnosis and diagnostic testing to include CAR, CT soft tissue neck, labs and CT chest, if CAR suspicious, as well as transfer to Lake Butler for general surgeon consult, transfer to be classified as "Urgent."

165.    Despite knowledge of HOWARD's diagnosis of squamous cell carcinoma, Dr. Cherry turned a blind eye to HOWARD and did nothing to follow up and/or implement the recommended course of care and did not implement a pain management plan for HOWARD.

166.    Defendant, Dr. Cherry, violated HOWARD's civil rights when Dr. Cherry exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

a.  Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

b.  Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c.  Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d.  Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e.  Failed to provide necessary and required pain medication to Plaintiff's

decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

f.   Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

g.   Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

h.   Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i.   Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

j.   Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

167.   As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

168.    That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

    a.   Reasonable medical, hospital, funeral and burial expenses;
    b.   Inhumane and tortuous conscious pain and suffering;
    c.   Loss of financial support;
    d.   Loss of service;
    e.   Loss of gifts or other valuable gratuities;
    f.   Loss of comfort, society and companionship;
    g.   Loss of consortium;
    h.   Economic and non-economic compensatory damages;
    i.   Punitive damages;
    j.   Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

### COUNT VIII
### VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS
### DEFENDANT, C. CALDERON, M.D.

169.    Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

170.    At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

171.    At all times relevant hereto, Defendant C. Calderon, M.D., Regional Medical Director, had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided

to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

172.    HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, said requests would have been in HOWARD's medical file. The very file Defendant, Dr. Calderon, would have examined and read when affirming consultation requests and/or examinations. Even a non-medical lay person would recognize the seriousness of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

173.    Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Calderon, who had knowledge of HOWARD's medical condition. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. HOWARD was never provided cancer treatment and/or pain medication.

174.    On February 27, 2015, a consultation request for emergency radiation therapy was made and signed by Defendant, Dr. M. Gonzalez, on March 2, 2015, and approved by Defendant, Calderon, on March 3, 2015.

175.    On March 30, 2015, Dr. Jean Dure, submitted an emergency consultation request

for an oncology evaluation and treatment with Dr. Montoya. Dr. Calderon, Medical Director at RMC affirmed the emergency request.

176.    Despite knowledge of HOWARD's diagnosis of squamous cell carcinoma, Dr. Calderon turned a blind eye to HOWARD and did nothing to follow up and/or implement the recommended course of care and did not implement a pain management plan for HOWARD.

177.    Defendant, Dr. Calderon, violated HOWARD's civil rights when Dr. Calderon exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

a.  Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

b.  Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c.  Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d.  Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e.  Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

f.  Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

g.  Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to

specialist(s), timely referral to a higher care outside medical facility;

h.   Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i.   Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

j.   Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

178.   As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

179.   That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a.   Reasonable medical, hospital, funeral and burial expenses;
b.   Inhumane and tortuous conscious pain and suffering;
c.   Loss of financial support;
d.   Loss of service;
e.   Loss of gifts or other valuable gratuities;
f.   Loss of comfort, society and companionship;
g.   Loss of consortium;

     h.   Economic and non-economic compensatory damages;

     i.   Punitive damages;

     j.   Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

**COUNT IX**
**VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, Dr. A. YU, M.D.**

180.    Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

181.    At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

182.    At all times relevant hereto, Defendant A. Yu, M.D., was a Physician at Holmes who had a duty to HOWARD to timely diagnose and of equal importance, render timely treatment to Plaintiff's decedent. In spite of an early diagnosis, no treatment was ever provided to HOWARD. Further, HOWARD was never provided pain medication other than over the counter ibuprofen.

183.    HOWARD issued several written requests for medical care and treatment as outlined in Paragraph 22 of this Complaint, said requests would have been in HOWARD's medical file. The very file Defendant, Dr. Yu, would have examined and read on the various contacts he had with HOWARD. Even a non-medical lay person would recognize the seriousness

of HOWARD's condition as set forth in HOWARD's medical request "the lump in my neck is spreading and also on the left of my neck a line of 4 lumps also in the back of my head and also my tongue and my throat swell up and I am coughing up blood. And I am losing my feeling in the left side of my body. My body hurts real bad."

184.    Prior to HOWARD's first visit with Dr. Yu, HOWARD presented to medical call at Holmes on September 19, 2014, September 21, 2014, and September 23, 2014. During these visits, the medical notes indicate swelling and spasms in the neck and back, limited range of motion, and pain radiating from the neck to the shoulders. On September 23, 2014, Dr. Ruiz Cordero ordered an X-ray which demonstrated anterior spurring of C1.

185.    Defendant, Dr. Yu, examined HOWARD on multiple occasions, the first believed to have been October 8, 2014 where Dr. Yu discovered a hard mass measuring approximately 1 ½" x 3" on the left side of HOWARD's neck which Dr. Yu assessed as a hematoma.

186.    On October 14, 2014, Defendant, Dr. Yu, again examined HOWARD whose notes indicate HOWARD could not feel his right arm, complained of headaches, and pain 8/10 on his neck and shoulder. Dr. Yu indicates "all new neurological deficits/changes" and ordered an ultrasound of HOWARD's neck.

187.    On October 15, 2014, Defendant, Dr. Yu, examined HOWARD whose notes indicate the mass is a knot and assessed HOWARD with a muscle strain.

188.    On October 21, 2014, Defendant, Dr. Yu, examined HOWARD for follow up regarding the neck mass and pain management. Dr. Yu provided no treatment plan other than decrease weight and decrease salt intake. Dr. Yu made a referral to an optometrist.

189.    On October 29, 2014, Defendant, Dr. Yu, examined Howard for complaints regarding pain due to the neck mass. Dr. Yu's notes indicate review of a October 28, 2014

ultrasound which had an impression of "complex cyst, possibly necrotic lymph node." Dr. Yu's plan indicated to follow up every week regarding the mass.

190.    However, Dr. Yu turned a blind eye to HOWARD and never followed up with HOWARD per his plan. Dr. Yu also never provided pain medication to HOWARD other than over the counter ibuprofen despite HOWARD's indications of pain 8/10, radiating pain, and numbness.

191.    Paragraphs 23 through 79 of this Complaint set forth in great detail HOWARD's medical history at Holmes, RMC, and Memorial Hospital of Jacksonville. Such records were reviewed by Defendant, Dr. Yu, who additionally had firsthand knowledge of HOWARD's medical condition through multiple examinations performed by Dr. Yu himself. On October 28, 2014, an ultrasound revealed necrotic lymph nodes in HOWARD's neck. On November 21, 2014, a CT revealed "enhancing left neck nodules likely adenopathy." On December 16, 2014, surgical pathology from a December 12, 2014 biopsy diagnosed "squamous cell carcinoma with extensive tumor necrosis." On February 26,2015, Dr. Fares performed a biopsy which again confirmed diagnosis of squamous cell carcinoma. Through this point in time, no treatment and/or pain medication was provided to HOWARD.

192.    Despite knowledge of HOWARD's diagnosis of squamous cell carcinoma and knowledge of the recommended course of care including radiation and chemotherapy, Dr. Yu turned a blind eye to HOWARD and did nothing to follow up and/or implement this course of care and did not implement a pain management plan for HOWARD.

193.    Defendant, Dr. Yu, violated HOWARD's civil rights when Dr. Yu exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

    a.   Failed to ensure treatment plan was carried out and complied with and/or following through on prescribed care for patient;

b. Failed to determine and recognize the immediate need for medical attention and the danger of an inmate experiencing a severe physical/medical disorder and failure to obtain proper medical attention for a prisoner whose dire condition necessitated same;

c. Recklessly, intentionally and/or willfully, and/or turning a blind eye, denying medical care to an inmate such as Plaintiff's decedent who Defendant knew needed serious medical attention;

d. Failed to implement a pain management plan to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

e. Failed to provide necessary and required pain medication to Plaintiff's decedent to abate and control the severe and unremitting pain and resulting suffering Plaintiff experienced from November, 2014 to July 14, 2015 (date of death);

f. Failed to obtain and expedite in a timely fashion the required diagnostic testing, referrals which were requested and/or medically required, and institute recommended treatment;

g. Defendant knew or should have known that HOWARD was not receiving timely and adequate medical care and treatment including but not limited to chemotherapy, radiation therapy, pain medication, diagnostic testing, hydration, caloric intake, surgery, timely referral to specialist(s), timely referral to a higher care outside medical facility;

h. Failure to report, communicate, and/or demanded, through chain of command (within the physician chain of command system, within the chain of command of the prison administration, within the chain of command within Corizon administration, up to and including the Director of Florida Department of Corrections), the medical care needs of HOWARD and the short comings or failure to deliver the same and continued such demand until such time as the appropriate timely care was commenced and continued for the HOWARD;

i. Failing to affirmatively report up the chain of command, the medical needs of Plaintiff and demand that immediate correction action be taken, herein above said Defendant's were deliberately indifferent by turning a blind eye to Plaintiff's decedent's serious medical needs;

j. Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

194.    As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

195.    That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a.  Reasonable medical, hospital, funeral and burial expenses;
b.  Inhumane and tortuous conscious pain and suffering;
c.  Loss of financial support;
d.  Loss of service;
e.  Loss of gifts or other valuable gratuities;
f.  Loss of comfort, society and companionship;
g.  Loss of consortium;
h.  Economic and non-economic compensatory damages;
i.  Punitive damages;
j.  Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT X
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS
## DEFENDANT, CORIZON

196.    Plaintiff hereby reincorporates and restates each and every allegation contained in

paragraphs 1-81 of this Complaint as if fully set forth herein.

197.   Defendant, Corizon, is the agent and/or ostensible agent of FDOC contracted to provide medical services within the Holmes Correctional Institution, RMC, and Memorial Hospital Jacksonville.

198.   Defendant, Corizon, by and through its agents, had the obligation and ability to medically treat HOWARD in a timely and effective manner, however Defendants Corizon did not provide any meaningful treatment for HOWARD's condition, Stage IV cancer.

199.   At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

200.   Pursuant to 42 USC § 1983, as well as the Eighth and Fourteenth Amendments, Defendant Corizon owed HOWARD  duties to properly supervise, monitor, and train its medical providers to diagnose and provide meaningful treatment to serious medical conditions and facilitate prompt and immediate medical attention.

201.   Defendant, Corizon, failed to provide medical care and medical administration at the level of standard of care for which they were contractually required and failed to provide the standard of care required by the Eighth and Fourteenth Amendments of the United States Constitution.

202.   In a letter dated September 26, 2014, from the FDOC to Corizon, the FDOC indicated that Corizon failed to provide the standard of care it was required by contract. The letter indicates that pursuant to FDOC audit, Corizon was found to be deficient in several areas and "corrective action plans are not being carried out and that the level of care continues to fall below the contractually required standard. "…Patient care issues, utilization management, and

communication…all three of these areas continue to be cause for concern."

203.    The Florida Department of Corrections performed audits of Defendant, Corizon, and knew that as of September, 2014, Defendant, Corizon, failed to provide medical care and medical administration at the level of standard of care for which they were contractually required and failed to provide the standard of care required by the Eighth and Fourteenth Amendments of the United States Constitution.

204.    Before September 2014, there was a marked increase in grievances by inmates at Holmes, RMC and MHJ, regarding healthcare, of which Defendant, Corizon, knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison healthcare system.

205.    Before September 2014, there was a marked increase in the number of inmate deaths at Holmes, RMC, and MHJ, pertaining to the quality of healthcare of which Defendant, Corizon, knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison health care system.

206.    Before September 2014, there was a marked decrease in the number of inmate medical transfers to outside medical facilities in Holmes, RMC, and MHJ of which Defendant, Corizon, knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison health care system.

207.    Before September 2014, there was a lack of medical physician staffing resulting in decreased quality of healthcare to inmates which resulted with an increased waiting time/delay for inmate medical treatment of which Defendant, Corizon, knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison health care system.

208.    Defendant Corizon breached these duties via its and/or absence thereof policies, procedures, regulations, customs and/or lack of and/or inadequate training, and thus exhibited a deliberate indifference toward inmates, and specifically toward HOWARD when Defendant, Corizon:

a.  Failure to train personnel about their constitutional obligations regarding the provision of meaningful and timely care for patients with serious medical conditions, follow up with patients, follow-through with treatment plans, and/or set up a pain management plan and/or failure to supervise its employees and/or agents regarding the same;

b.  Implicit and/or explicit authorization, approval and knowing acquiescence in policies which would shift around patients until patient was too sick to qualify for remedial care;

c.  Implicit and/or explicit authorization, approval and knowing acquiescence in policies which would provide an early release to patients with serious medical conditions rather than provide meaningful treatment to patient;

d.  Implicit and/or explicit authorization, approval and knowing acquiescence in policies which would shift around patients with serious medical conditions while not actually providing meaningful (expensive) treatments, in this case radiation and chemotherapy for cancer;

e.  Implicit and/or explicit authorization, approval and knowing acquiescence in policies which favored cost-savings over the provision of meaningful treatment for patients with serious medical conditions;

f.  Implicit authorization, approval and knowingly acquiescence in the wrongful conduct by Corizon by its agents and/or employees in the treatment of inmates;

g.  The use of and acceptance of withholding of medical care, withholding of safety measures, and/or delay of medical care;

h.  Failure to discipline or terminate personnel known to have engaged in the use of, withholding of medical care, punishment of those suffering medical conditions, or other inappropriate practices and creating an atmosphere where medical personnel believe they will not be disciplined for deliberate indifference toward inmate medical needs;

i.  The failure to initiate and conduct any meaningful investigation as to the failure to deliver medical care, and the death of Plaintiff's decedent;

j.  Failure to eliminate medical policies, practices and customs which deviate from applicable federal and state standards for jail operations;

k.  Permitted the implementation of inappropriate de facto policies which reflected or represented policies, practices and customs which deviated from acceptable standards;

l.  Creating and encouraging secrecy and a code of silence within the, Corizon, medical vendor system, the medical care providers including but not limited to the named physicians;

m.  Failure to train and supervise medical personnel physician and nursing staff at the Holmes, RMC (Main and West) and Memorial Hospital of Jacksonville to properly determine medical emergent, medical urgent and/or medical emergencies presentments and failed to do so and such omitted training and supervision was in willful and wanton disregard for decedent Ronald Alexander Howard, II's serious medical needs and was grossly negligent and a reckless act;

n.  Knowingly and recklessly failing to discipline, instruct, supervise or control, physicians, nurses and/or other medical administration, personnel conduct and thereby encouraging acts and omissions that contributed to the death of decedent, Ronald Alexander Howard, II, and other similarly situated inmates;

o.  Knowingly and recklessly hired, trained and supervised, physicians, nurses and/or other medical personnel who are not able to determine serious medical conditions which render them unfit to perform the necessary duties of the position;

p.  Failed to adequately train and supervise Corizon personnel and physicians, nurses and/or other medical personnel to properly care for, obtain medical treatment, supervise and provide care and treatment to decedent, Ronald Alexander Howard, II, that was not deliberately indifferent to Plaintiff that amounted to a reckless indifference to life;

q.  Knew or should have known that by September of 2014, there was a marked upward increase in grievances by inmates in Holmes, RMC (Main and West) and Memorial Hospital of Jacksonville, pertaining to health care, in spite of such knowledge said Defendants, supra, did not take timely action to correct, remedy the systemic failure of the prison health care system;

r.  Knew or should have known that by September of 2014, there was a marked upward increase in the upward number of inmate deaths in

Holmes, RMC (Main and West) and Memorial Hospital of Jacksonville, pertaining to health care, in spite of such knowledge said Defendant did not take timely action to correct, remedy the systemic failure of the prison health care system;

s. Knew or should have known that by September of 2014, that there was a marked decrease in the number of inmate medical transfers to outside medical facilities in Holmes, RMC (Main and West) and Memorial Hospital of Jacksonville, pertaining to health care, in spite of such knowledge said Defendants, supra, did not take timely action to correct, remedy the systemic failure of the prison health care system;

t. Knew or should have known that by September of 2014, there was a lack of medical (physicians) staffing resulting in decreased quality of health care services to inmates with resulting increase in wait time or delay of medical treatment;

u. Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

209.   As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

210.   That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a. Reasonable medical, hospital, funeral and burial expenses;
b. Inhumane and tortuous conscious pain and suffering;
c. Loss of financial support;
d. Loss of service;
e. Loss of gifts or other valuable gratuities;

f.  Loss of comfort, society and companionship;
g.  Loss of consortium;
h.  Economic and non-economic compensatory damages;
i.  Punitive damages;
j.  Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

## COUNT XI
## VIOLATION OF EIGHTH AND FOURTEENTH AMENDMENTS DELIBERATE INDIFFERENCE OF PLAINTIFF'S SERIOUS MEDICAL NEEDS DEFENDANT, OLUGBENGA OGUNSANWO, MD, DEFENDANT, DR. THOMAS REIMERS, AND DEFENDANT, JULIE JONES

211.  Plaintiff hereby reincorporates and restates each and every allegation contained in paragraphs 1-81 of this Complaint as if fully set forth herein.

212.  At all times relevant hereto, pursuant to 42 U.S.C. § 1983, as well as the Eighth, and Fourteenth Amendments to the United States Constitution, HOWARD had the right to medical treatment for serious medical needs while in custody as well as to be free from cruel and unusual punishment.

213.  Defendant, Olugbenga Ogunsanwo, MD Assistant Secretary of Health Services of the FDOC, Defendant, Dr. Thomas Reimers, Health Service Director of the FDOC, and Defendant , Julie Jones, Secretary of the FDOC were in charge of oversight and compliance of Corizon, and Defendants set out and implemented FDOC guidelines and standards with respect to healthcare of inmates.

214.  Pursuant to 42 USC § 1983, as well as the Eighth and Fourteenth Amendments to the United States Constitution, Defendants, Ogunsanwo, Reimers, and Jones, owed HOWARD

certain duties to properly supervise, monitor, and ensure that FDOC medical vendor, Defendant, Corizon, was providing quality medical care which met the standard of care required by the Eighth and Fourteenth amendments.

215.    In a letter dated September 26, 2014, from the FDOC to Corizon, the FDOC indicated that Corizon failed to provide the standard of care it was required by contract. The letter indicates that pursuant to FDOC audit, Corizon was found to be deficient in several areas and "corrective action plans are not being carried out and that the level of care continues to fall below the contractually required standard. "…Patient care issues, utilization management, and communication…all three of these areas continue to be cause for concern."

216.    Defendant, Ogunsanwo, and Defendant, Reimers, were recipients of this letter from the FDOC to Defendant, Corizon, dated September 26, 2014, and at all times relevant hereto had knowledge of the deficient health care provided by Corizon at FDOC facilities including Holmes, RMC, and MHJ and failed to take corrective actions with respect to such knowledge.

217.    Defendant, Julie Jones, who is head of the FDOC as Secretary, had knowledge of the deficient healthcare provided by Corizon at FDOC facilities including Holmes, RMC, and MHJ. Julie Jones specifically acknowledged the grave deficiencies in the prison healthcare system by Corizon during discussions with the Florida Senate Criminal Justice Committee on or around January 2015. Despite such knowledge, Defendant Jones failed to take corrective actions with respect to such knowledge.

218.    Defendant, Corizon, failed to provide medical care and medical administration at the level of standard of care for which they were contractually required and failed to provide the standard of care required by the Eighth and Fourteenth Amendments of the United States

Constitution.

219.    The Florida Department of Corrections performed audits of Defendant, Corizon, and knew that as of September, 2014, Defendant, Corizon, failed to provide medical care and medical administration at the level of standard of care for which they were contractually required and failed to provide the standard of care required by the Eighth and Fourteenth Amendments of the United States Constitution.

220.    Before September 2014, there was a marked increase in grievances by inmates at Holmes, RMC and MHJ, regarding healthcare of which Defendants knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison healthcare system.

221.    Before September 2014, there was a marked increase in the number of inmate deaths at Holmes, RMC, and MHJ, pertaining to the quality of healthcare of which Defendants knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison health care system.

222.    Before September 2014, there was a marked decrease in the number of inmate medical transfers to outside medical facilities in Holmes, RMC, and MHJ of which Defendants knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison health care system.

223.    Before September 2014, there was a lack of medical physician staffing resulting in decreased quality of healthcare to inmates which resulted with an increased waiting time/delay for inmate medical treatment of which Defendants knew or should have known. Despite such knowledge, did not take timely action to remedy the systemic failure of the prison health care system.

224.    Defendant, Olugbenga Ogunsanwo, MD Assistant Secretary of Health Services of the FDOC, Defendant, Dr. Thomas Reimers, Health Service Director of the FDOC, and Defendant, Julie Jones, Secretary of the FDOC, violated HOWARD's civil rights when Defendants exhibited deliberate indifference toward HOWARD's serious medical condition in the following ways:

a.  Failure to properly supervise medical vendors, specifically Corizon;

b.  Failure to initiate and conduct any meaningful investigation and/or remedial measures with regard to medical service deficiencies by Corizon;

c.  Implicit authorization, approval and knowingly acquiescence in the wrongful conduct by said Corizon and/or their employees, agents or ostensible agents in the treatment of inmates;

d.  The failure to initiate and conduct any meaningful investigation as to the failure to deliver medical care, and the death of Plaintiff's decedent;

e.  Failure to eliminate medical policies, practices and customs which deviate from applicable federal and state standards for jail operations;

f.  Permitted the implementation of inappropriate de facto policies which reflected or represented policies, practices and customs which deviated from acceptable standards;

g.  Defendants knew or should have known that by September of 2014, there was a marked upward increase in grievances by inmates in Holmes, RMC (Main and West) and Memorial Hospital of Jacksonville, pertaining to health care, in spite of such knowledge said Defendants, did not take timely action to correct, remedy the systemic failure of the prison health care system;

h.  Defendants knew or should have known that by September of 2014, there was a marked upward increase in the upward number of inmate deaths in Holmes, RMC (Main and West) and Memorial Hospital of Jacksonville, pertaining to health care, in spite of such knowledge said Defendant did not take timely action to correct, remedy the systemic failure of the prison health care system;

i.  Defendants knew or should have known that by September of 2014, that there was a marked decrease in the number of inmate medical transfers to outside medical facilities in Holmes, RMC (Main and West) and

Memorial Hospital of Jacksonville, pertaining to health care, in spite of such knowledge said Defendants did not take timely action to correct, remedy the systemic failure of the prison health care system;

j.  Defendants knew or should have known that by September of 2014, there was a lack of medical (physicians) staffing resulting in decreased quality of health care services to inmates with resulting increase in wait time or delay of medical treatment in spite of such knowledge said Defendants did not take timely action to correct, remedy the systemic failure of the prison health care system;

k.  Any and all other breaches that become known during the course of discovery which is hereby incorporated by reference.

225.   As a direct and proximate result of the constitutional violations alleged above, HOWARD was denied necessary and lifesaving treatment for his diagnosed squamous cell carcinoma. Because he was denied proper treatment, the carcinoma grew and metastasized throughout HOWARD's body resulting in compression on the spinal cord causing quadriplegia. HOWARD's inability to move secondary to the quadriplegia resulted in the development of pneumonia which progressed into sepsis. HOWARD's pneumonia and resultant sepsis caused further deterioration of his condition and culminated in his death on July 14, 2015 secondary to complications related to his metastatic squamous cell carcinoma.

226.   That as a proximate cause of Defendant's acts and/or omissions, Plaintiffs suffered the following:

a.  Reasonable medical, hospital, funeral and burial expenses;
b.  Inhumane and tortuous conscious pain and suffering;
c.  Loss of financial support;
d.  Loss of service;
e.  Loss of gifts or other valuable gratuities;
f.  Loss of comfort, society and companionship;
g.  Loss of consortium;
h.  Economic and non-economic compensatory damages;
i.  Punitive damages;
j.  Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. §1983 and §1988 and any and all damages otherwise recoverable under common law.

WHEREFORE, Plaintiff prays that this Honorable Court enter a Judgment in her favor and against Defendants jointly and severally, in an amount in excess of $75,000.00, as well as an award for costs, interest and attorney fees as well as punitive and/or exemplary damages.

Dated: March 6, 2018

          Respectfully submitted,

          FIEGER, FIEGER, KENNEY & HARRINGTON, PC

          By:  /s/ Geoffrey N. Fieger
          GEOFFREY N. FIEGER (297305)
          Fieger, Fieger, Kenney & Harrington, P.C.
          Attorneys for Plaintiff
          19390 West Ten Mile Road
          Southfield, Michigan  48075
          Telephone:  (248) 355-5555
          Facsimile:  (248) 355-5148

          DREW LAW OFFICE

           /s/  Sean W. Drew
          Attorney for Plaintiff
          Sean W. Drew (P33851)
          302 Sycamore Street, P.O. Box 880
          Niles, MI    49120
          (269) 683-5121-phone
          (269) 683-2195-fax
          drewlawoffice@gmail.com

## JURY DEMAND

Plaintiff CATHY PACK as Personal Representative of the Estate of Ronald Alexander Howard, II, Deceased by and through her attorneys, Drew Law Office, and Fieger Law, hereby relies on the jury demand previously filed in this action.

Dated: March 6, 2018                    Respectfully submitted,

FIEGER, FIEGER, KENNEY & HARRINGTON, PC

By:  _s/s/ Geoffrey N. Fieger_____
GEOFFREY N. FIEGER (297305)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan  48075
Telephone:  (248) 355-5555
Facsimile:  (248) 355-5148

DREW LAW OFFICE

_/s/  Sean W. Drew_____
Attorney for Plaintiff
Sean W. Drew (P33851)
302 Sycamore Street, P.O. Box 880
Niles, MI    49120
(269) 683-5121-phone
(269) 683-2195-fax
drewlawoffice@gmail.com